O. D. PILLOW *v.* JAMES H. THOMAS, Trustee, *et als.*

GUARDIAN. *Power of to contract with husband of his minor ward for settlement of her estate.* Inasmuch as guardian of minor ward can by bill in Equity, filed for that purpose, compel a settlement of the wife's property upon her, or its investment for her benefit, it follows that he may stipulate for such an investment as a Court of Equity would compel. And when the husband receives the funds of his wife upon such an agreement, and invests them in the mode stipulated for, and takes title in his own name, he holds as trustee for his wife; and this, though the wife was no party to the agreement.

Prichard *v.* Wallace, 4 Sneed, 405; Story's Eq., Sec. 1,210 and notes, and Sec. 1,211*a*.

O. D. Pillow *v.* James H. Thomas, Trustee, *et als.*

EVIDENCE. *Wife's testimony. When inadmissible.* A wife's testimony is inadmissible as to communications and transactions between her and her husband during coverture, though the husband be dead at the time of testifying.

4 Heisk, 425; State *v.* McCauley.

SAME. *Character of testimony adequate to establish a resulting trust. Admissions of Trustee.* While the rules of law require the most satisfactory and convincing evidence to establish a trust of the character, and under the circumstances stated in the bill, it is well settled now that such a trust may be established upon the admissions of the trustee or party sought to be charged as such.

Prichard *v.* Wallace. 4 Sneed, 408; Perry on Trusts, Sec. 137; Hill on Trustees, 153.

SAME. *Admissions. Caution as to.* The admissions of a party are always liable to be misunderstood, and in a case where it is sought to set up a claim against the recitals of a deed, the evidence should be clear, full and convincing, especially after the lapse of many years, or when the trust is not claimed until after the death of the alleged trustee.

Bro. on F., Sec. 91.

ARGUENDO. *What insufficient to create resulting. Trust.* If the agreement was not that the title to the land should be taken to complainant, but that her husband should take it to himself, and that he should then, at some indefinate future time, settle it upon, or convey it to, the wife, such an agreement, being a parol promise to convey land, would be void by the statute of frauds. The trust must result, if at all, at the instant the deed is taken and the legal title vests in the grantee.

Perry on Trusts, Sec. 133.

TESTIMONY. *Insufficiency of to establish a resulting trust.* The testimony as stated in this opinion held to be insufficient to establish a resulting trust.

DOWER. *Right to under Section 2,399 of the Code does not exist. When.* Pillow conveyed land to Thomas in trust to pay debts, January 1st, 1867. In August thereafter the Trustee and Pillow agreed, in writing, to sell it to Williams. Pillow, in writing, conveyed and relinquished his right to redeem. The contract of sale was reported to the Chancery Court and confirmed in September. The possession was surrendered to Williams. Pillow died in the fall of 1868. Held, that Pillow's widow was not entitled to dower.

O. D. Pillow *v.* James H. Thomas, Trustee, *et als.*

SALE OF MORTGAGED PROPERTY.  *When sufficient to exclude dower.* When the maker of a deed of trust joined with the trustee in a sale of the land under the deed of trust, and the sale was confirmed by the Court, it was not essential that title should have been divested and vested, formally, to exclude the right of dower. The sale under the deed was sufficient to this end.

### FROM MAURY.

Appeal from the decree of the Chancery Court. ALBERT S. MARKS, Chancellor.

NICHOLSON, LOONEY and HICKEY for complainants.

J. H. THOMAS (who files a brief himself) and L. D. MYERS for defendants.

J. S. WILKES for Ewing and wife.

DEADERICK, Judge, delivered the opinion of the Court.

The bill in this case was filed in the Chancery Court at Columbia, on the 11th of January, 1869.

Its substantial allegations are that complainant, in November, 1833, being then about 17 years of age, intermarried with Granville A. Pillow; that at the time of her marriage her father was dead, and she was living with Robert Williams, her guardian and uncle, in the State of Kentucky; that her said guardian had in his hands, belonging to her, six slaves, and $5,600 in notes; that her guardian was opposed to her marriage with said Pillow, and refused to deliver any portion of her estate, consisting of about 1,100 acres of

land, and town lots in Springfield, Tennessee, and of the said slaves and notes, to her said husband until he was satisfied that her husband had contracted for, or was negotiating for, a tract of valuable land in Maury County, Tennessee, and until he obtained from her husband an express agreement that all of said property should be vested in the purchase of said land, and that the same should be settled on complainant; that about the 15th of March, 1834, her said husband entered into a contract with the widow and heirs at law of his deceased father, Gideon Pillow, for the purchase of said tract of land, containing 525 acres, at the price of $19.21 per acre, and gave his notes therefor in five annual instalments; that this purchase was made for the express purpose of carrying out the agreement made by her husband with her guardian, and her guardian refused to give up her funds until the purchase was agreed on; that by the 20th of February, 1835, her husband had received from her guardian, and paid to Gideon J. Pillow, on said purchase, $3,460, $460 paid December 9, 1834, and $3,000 February 20, 1835; that on July 2, 1835, the widow and heirs of Gideon Pillow, deceased, executed a deed for said land to her husband, Granville A. Pillow, without her knowledge and consent, and in violation of said agreement, and she believed, until within a few years past, that the title had been made to her; that her said husband received of her guardian the whole amount of the notes in his hands as they were collected, amounting to the sum of $5,600, and this was applied towards the payments

O. D. Pillow v. James H. Thomas, Trustee, et als.

due for the land; that her husband sold five of her slaves for $2,000, and this sum was also applied to the payment for the land, and that the last note, due in 1839, was held up until 1841, when her Robertson County land was sold for $4,000, and the balance due upon the Maury County land discharged out of proceeds of the sale of her land; that resting under the belief that the Maury County land had been conveyed to her, she consented, after her husband had undertaken to build a dwelling-house upon it, to the sale of lands devised to her by her uncle and late guardian, and that the proceeds of said sale, being about $3,000, and $1,000 bequeathed her by her mother, amounting in the aggregate to $4,000, should be applied to aid in the construction of the dwelling upon the land—thus making about $16,000 of her means used in the purchase and improvement of the Maury County place, in pursuance of the agreement between her uncle and guardian and herself and her said husband, and by which agreement the land was to become her property; that she lived upon the property for many years, not doubting it was her own, and such were the uniform declarations of her husband to herself and to others.

The bill then alleges that on the 1st day of January, 1867, her husband conveyed his whole tract of 822 acres, including the 525 acres before referred to, and all his personal property, of every description, to defendant Thomas, as trustee, to secure the payment of all his debts—the debts enumerated in the trust deed amount to $50,000, but the

O. D. Pillow *v.* James H. Thomas, Trustee, *et als.*

deed provides for all the debts, though not named therein; that the trutsee was proceeding to execute the trust by the sale of the land, when, on May 16, 1867, he was enjoined from making the sale by Gideon J. and Jerome B. Pillow; that in August, 1867, said trustee and G. A. Pillow, complainant's husband, entered into written contract for the sale of 538 acres, including said 525 acres, claimed by complainant, to J. Minnick Williams, at the price of $75 per acre; $10,000 was paid down, and notes executed for the balance. this sale was reported to the Chancery Court, and sale confirmed, but the title was not divested out of Pillow or his trustee. Williams took possession of the land, but has made no further payment.

Upon the following statement of facts complainant insist she has a resulting trust in said land, or an equitable lien thereon, which is superior to the title acquired by Thomas as trustee, or said Williams as purchaser.

It is further stated in the bill that G. A. Pillow, on the 8th January, 1866, made his will, and that he died on the —— day of ——, 1868; that the will was proved at the —— Term, 1868, of the County Court of Maury County, and that at the January Term, 1869, of said County Court, complainant dissented from said will, and was qualified as executrix thereof.

Said Thomas, as trustee, and I. Minnick Williams and Susan Martin, complainant's daughter, and her husband, Hugh Martin, and G. A. and W. C. Pillow,

her sons, the said Susan, G. A. and W. C. Pillow being heirs at law of said Granville A. Pillow, deceased, are made defendants.

The bill prays in the alternative for dower in the 822 acres of land conveyed, if she should not be entitled to the 525 acres on the facts stated.

The trustee, Thomas, filed his answer denying any personal knowlege of the material averments in the bill, and requiring strict proofs of its allegations. He admits the sale of the 525 acres to Williams, in which G. A. Pillow, deceased, united, and insists that the land sold was the property of said Granville, not encumbered by any charge in favor of the wife.

Defendant, Williams, also answered that he had no knowledge or information as to the parentage of complainant, or the amount or character of the estate derived by her from her parents or uncle, and guardian, or when, to whom, or in what manner the same was . paid over, and of these facts required strict proof; that he bought 523 acres of the 822 belonging to said Pillow, but not the identical 525 claimed by complainant; that he bought without any notice of complainant's claim, and has paid $10,000 of the price and made large expenditures on the place in improvements; that he adopts the answer of his co-defendant, Thomas, and insists upon the validity of his purchase.

Upon the pleadings the question is presented whether the complainant has made such a case as entitles her to the relief prayed, or to any relief.

And secondly, if the facts alleged are such as to

O. D. Pillow *v.* James H. Thomas, Trustee, *et als.*

entitle complainant to relief, are they established by such evidence as is required in such cases.

While it is true that, at law, the act of marriage operates as an absolute gift to the husband of all the personal chattels and choses in action belonging to the wife, if reduced into possession, by the husband in his life-time, it is equally well settled by the decisions of the Courts in repeated cases that the guardian of his minor ward may file a bill in her behalf, and restrain the husband from taking possession of his wife's personalty, and the Courts will even, against the protestation of such wards, settle the whole of her estate upon her, in cases where the husband is insolvent or improvident, to the exclusion of his marital rights.

This jurisdiction was exercised at the present Term in the case of *Murphy*, guardian, v. *Green and wife.*

In the case of *Phillips and wife* v. *Hapell*, administrator, the husband and wife were seeking to collect a sum of money due the wife from her guardian, pending the suit, "several of her relatives" petitioned the Court to settle upon her the whole amount due her, on account of tender age—about 15 years—and the insolvency of her husband. Against her protestations the Court made the settlement of the amount found due, declaring that Courts of Equity standing in *loco parentis* will not allow the husband to obtain possession of the wife's property without making a suitable provision for her, unless she, being capable of giving consent, voluntarily waives her right.

And it is immaterial by whom the application for the settlement is made, whether by the wife with her husband, or next friend, or by a third person in her behalf.    10 Hum., 199.

If, therefore, the guardian of his minor ward could, by bill in equity filed for that purpose, compel a settlement of the wife's property upon her, or its investment for her benefit, we are of opinion that he may stipulate for such an investment as a Court of Equity would compel, and when the husband receives the funds of his wife upon such agreement, and invests them in the mode stipulated for, and takes title in his own name, he holds as trustee for his wife.

The guardian might have refused the husband's demand for the wife's property, and he could not have enforced it without making settlement upon her.    And the technical objection that the promise to invest for her benefit was not made personally to the wife, but to her guardian, can not exonerate the husband from his obligation to perform his promise.

If the money was obtained from the guardian of his minor ward upon the express undertaking of the husband, to invest in a particular tract of land, and it was so invested for her, she will not be deprived of the benefit of the investment, because her guardian, and not herself, made the agreement for her benefit.

In the case of *Pritchard* v. *Wallace*, 4 Sneed, 405, where the husband got proceeds of the sale of the wife's land upon agreement to invest in other lands for her benefit, and took title in his own name, it

was held that the husband held as trustee for the wife.

In the same case the bill sought to establish a trust to the extent of the value of personal estate received by the husband from the wife's father's estate. But the Court refused this because as to the personal estate or money, the husband had reduced that to possession, and the wife had taken no steps to secure a settlement, and there was no evidence that she was prevented from doing so, by any promise or agreement of her husband to invest it for her benefit. Story's Eq., §§ 1,210 and notes, and Sec. 1,211a.

It is settled by the decisions of our own Court that the husband may become trustee for his wife when he takes her property, which he promises to invest for her, and does so invest. 4 Sneed, 410, and cases cited.

We think, therefore, that the facts alleged in the bill, if established by sufficient evidence, will entitle complainant to relief.

In considering the evidence, we can not regard the testimony of Mrs. Pillow as to transactions with or declarations of her husband. The case of State v. McCauly, 4 Heisk., 425, and other cases determined by this Court, are conclusive against the admissibility of the wife's testimony as to communications and transactions between her and her husband during coverture.

No other witness pretends to have witnessed or heard the agreement made between the husband and

guardian of complainant. All the evidence tending to establish it is derived from the admissions and declarations of the husband at various times, as proved by the testimony of various witnesses.

While the rules of law require the most satisfactory and convincing evidence to establish a trust of the character, and under the circumstances stated and set out in the bill, it is well settled now that such a trust may be established upon the admissions of the trustee, or party sought to be charged as such.

In *Pritchard* v. *Wallace,* 4 Sneed, 408, Judge Caruthers, in delivering the opinion of the Court, says: "That the proof is entirely satisfactory that she (the wife) was induced to concur in the sale and conveyance of the land in Montgomery County, upon a distinct agreement upon his (the husband's) part, that the amount received for it should be invested in other lands in West Tennessee for her benefit," and again he says: "There can be no doubt, from the evidence, that before the wife consented to the sale of her land her husband agreed, and distinctly promised her, to invest the proceeds for her benefit," etc. Judge Caruthers states, in the opinion, that "there was not, perhaps, any clear and distinct proof by any one present at the time that such an agreement was made between them, but the declarations and acts of both establish the fact with equal conclusiveness. He seemed to have no concealment on the subject, but during the whole period, from the date of the transaction down to his death, declared the facts to any one who talked with him

in relation to the land sold and purchased." See also Perry on Trusts, Sec. 137; Hill on Trustees, 153.

It thus seems that the evidence of the admissions of the nominal purchaser as to facts of the agreement and receipts of the money, and payment of it, if full, clear, distinct and convincing, will be sufficient to authorize the Court to declare and establish the trust.

From the settlement of complainant's guardian with the County Court, it appears that on January or February, 1834, the guardian paid to complainant's husband, of his ward's money, $2,737.60, and on April 24, 1834, $1,654.22, and on September 18, 1834, $24.66 in full, making the aggregate sum of $4,416.48 received from the guardian.

The land was purchased by Granville A. Pillow from his mother, brothers and sisters, in October, 1834; a payment of $460 was made on December —, 1834, and on February 20, 1835, a payment of $3,000 was made.

It appears from the record that Major Pillow had not the means to make payments for the land, aside from the money received from his wife's guardian, unless he had received them from a sale of a tract of land owned by him in Giles County. He sold this tract of land to one John Phillips for about $7,337, and it is insisted that the $3,000 paid upon the "home tract" by Major Pillow, on February 20, 1835, was derived from his sale to Phillips, of that date, of the Giles County tract of land, and the testimony of Gen. Gideon J. Pillow is relied upon to establish this propo-

sition, in addition to the recital in the deed of the con-sideration, with the words "the receipt whereof is hereby acknowledged."

Mrs. Martin, thirty-four years of age in September, 1869, when her deposition was taken, is complainant's daughter, and testified that after the foundation of the house was dug, and the work commenced in 1849 or 1850, she heard her father say that he would have to stop the work unless her mother would agree to apply the property inherited by her from her uncle and mother, towards building the house, and as the land belonged to her he thought it would be the best investment for her; that the negroes and land were sold and proceeds applied towards the building; had often heard her father say that her mother was opposed to the sale of her land in Kentucky, but rather than have the building stopped, consented to sell it.

This witness further states that she had heard her father say at different times, that the only condition upon which her mother's guardian would relinquish her mother's property to him was, that he should invest her means in a house (home) and settle it on her; and he often said that he always intended to keep his word, and settle the home place on her, but had deferred it until he became embarrassed, and it was too late; and have heard him say that he sold some land and negroes belonging to her mother, for which he had received the money, and had appropriated it to the payment of the "home place." Witness states that her mother did not know the "home place" was not settled on her until

after the war; heard her father say often that the home place was paid for by her mother's money, and that it was her property, and after the deed of trust to Thomas was executed, often heard her. father express regret that he had not settled the home place on complainant, as he had promised to do; but he had neglected it because he was so well off, and thought he could do it at any time, and after he became involved he could not.

Mrs. Aaron V. Brown, sister to Major Pillow, states that she never heard her brother say his wife's guardian refused to surrender her property to him until he agreed to invest it in a tract of land for her; had heard her brother say that his wife reproached him for not settling the home place on her. He said before the war he was rich, and there was no necessity for his doing so, and since the war his embarrassment prevented it.

Mrs. M. C. Pillow, daughter-in-law ot the complainant, states that in April, 1867, and in June, 1868, Major Pillow told her that his wife's guardian agreed to surrender his wife's property on condition that he would buy the land in Maury County and settle it on complainant, and that his wife's money had bought the place and built the house.

Granville, jr., son of Major Pillow, states he was born in April, 1843; had heard his father say that complainant's guardian stipulated that he was to settle a home on her in Tennessee in consideration of her property being turned over to him, and that the home place

was bought with her money. This, he thinks, was when the foundation of the house was being laid.

Mrs. Wiley and Mr. Vinson testify to conversations of Major Pillow after the date of. the trust deeds, which were objected to, and are inadmissible to impeach the conveyance made by him. The same objection applies to the testimony of Mrs. M. C. Pillow.

William Galloway knows that Major Pillow said the home place was forbidden fruit, and belonged to his wife; that he had used a large portion of her money in paying for the land and erecting improvements; that the land was partly paid for by her means, and the buildings erected in the same way.

W. F. Tyler states that he lived with Major Pillow as overseer from 1854 to 1862, and heard Major Pillow say that he agreed with his wife's guardian that if he would give up the property to him, he would settle the home place on her. This was said in 1857, and at several other times, and witness frequently heard him say that his wife's money paid for the house, but never heard him say her money paid for the land, nor did he ever hear complainant say so. She claimed that Major Pillow agreed if he got the property he would settle the land upon her, and in 1856 and 1857 heard her insisting upon Major Pillow's settling the land on her, and in 1858 she was frequently urging him to settle the home place on her, saying if he did not it would be sold to· pay his debts.

J. C. Rye, brother-in-law to complainant, states that

while the house was being built Major Pillow said he was not able to go on with it without the sale of the property of complainant, derived from her mother and uncle Williams. The Williams' land and one negro was sold. In 1853 he heard Mrs. Pillow speak of wanting a home settled upon her. She spoke of it twice or oftener. She did not say that Major Pillow had agreed to do so.

G. Brown states that Major Pillow said his wife's guardian would not let him sell her lands in Kentucky, as she was a minor, unless he would invest the proceeds in other lands or its equivalent.

Mrs. A. V. Brown states that soon after the marriage of Major Pillow, he and Mrs. Pillow stopped at her house on their way to and from Kentucky, and that Major Pillow told her his object in going to Kentucky was to sell his wife's land there, but that her guardian and family were all opposed to his selling it.

Mary Pillow and Sam Holmes, both former slaves of Major Pillow, testify to certain conversations of Major Pillow. But aside from the fact that their general character is impeached, some facts stated by them are of a character that, at their age, and after the great length of time elapsed since the alleged conversations, we are of opinion that their statements are the result of impressions much more recently made, probably from hearing others talk about the matter.

The foregoing is a brief abstract of the most material parts of the evidence on the part of the complainant.

For the defendant, W. A. Wilbanks states that he

went to live with Major Pillow the spring after he (Pillow) was married, and remained with him until 1856, and often heard Mrs. Pillow ask her husband, both before and after the house was built, to settle the place on her, as she said she wanted something to call her own; never heard anything of any agreement by him to do so, or of her money having bought the land. Major Pillow would reply to complainant's request to settle the property on her, that he must be out of debt to make it valid, and that she had all the benefit of the place, and some times he would listen and not reply.

Mrs. J. C. Rye is a sister of the complainant, and states that Mrs. Pillow, the complainant, said to her that Major Pillow said it made women foolish to have property independent of their husbands, and for this reason he had always refused to settle any upon her. Witness was also a ward of complainant's guardian, and never heard of any conditions imposed upon payment of her sister's property to her husband—none were required as to her property.

Minnick Williams states that he visited the place of Major Pillow in August, 1867, with a view to buying it; that Major Pillow was absent, but complainant met him at the door, and he stated the object of his visit to her. The property was then advertised for sale. She took him through the house, calling his attention to the superior style of its construction, and said Major Pillow's embarrassment made it necessary to sell the property, but she would like to retain the residence and 50 or 100 acres of the land. Witness replied that

he would not purchase any unless he could get the improvements. Complainant stated that she would like to have him buy it, and if he did she would like to sell him some of the furniture, carpets, etc. Witness had no knowledge whatever of complainant's claim to the property until after he ' purchased, and made his cash payment. In the latter part of December, 1868, he heard a rumor that complainant set up a claim to the property, but had no positive information of it until she filed her bill. About October 1, 1867, complainant told witness for the first time that her money had been expended upon the improvements put upon her land, but did not say that the land had been paid for by her, or with her money, or that she had any claim to it whatever.

Gen. Gideon J. Pillow states that he is brother to the late Granville A. Pillow, and they lived for 30 years upon, almost, adjoining plantations. That their relations were intimate and confidential, and he never heard of any promise by his brother to invest the means received from her guardian to her separate use, or to make any settlement upon her, or of any such promise being asked or required to enable him to get her means from her guardian. He states that the Giles County land of 657 acres was sold to meet the payments upon the Maury tract purchased by his brother; that this sale was determined on by the heirs of Gideon Pillow, deceased, but a short time before the execution of the contract, to convey, on the 30th October, 1834, and after the marriage of

complainant, and after her mother and sister came to the place to live with her; and that in consequence of the dissatisfaction of witness' mother after complainant's mother and sister removed to the home place, it was, upon a consultation of the heirs, agreed to sell the place to Granville. By the terms of the contract the said Granville was to pay to his mother, Ann Pillow, on the 1st March, 1835, $3,000, in satisfaction of her claim to dower, the balance payable in annual installments of $2,000, except the last payment falling due 1st March, 1839, which was for the balance due for the tract estimating 525 acres, at $19.21 cents per acre.

Witness states that he wrote the deed of Granville A. Pillow to Phillips for the Giles County tract, and witnessed it, which deed bears date 20th of February, 1835, and upon that day Granville A. paid to him $3,-000, the first payment upon the Maury County land, for which he executed his receipt; that he knew his brother sold the Giles County land to pay for the Maury place, and is satisfied the means were so applied, if not entirely, to a very great extent; that his brother sold the Giles land for part cash, $3,000, as he thinks, and the balance on credit. Again, he says, that he does not doubt that the cash payment upon the Maury place was made by the cash payment made on the Giles place, 'and such was his recollection of the facts before he saw the receipt and deed, and the identity of their dates. Witness further states, that his brother was in debt for purchases of land and negroes made in 1832 in about the sum of

$4,200; that his cash means were limited, and he is satisfied that the money, or a large part of it, that he got by his wife, went to pay off these debts.

Jerome B. Pillow states, he is a brother to G. A. and Geo. J. Pillow, and they lived for thirty years within one and a half miles of each other, and Granville rarely transacted any important business without consulting him or Geo. J. Pillow, and each knew almost as much of the others' business as he did of his own; that within a year or less after the marriage of Granville, his mother became dissatisfied with living with Granville on account of his wife and her mother living there, and this led to a proposition, as the witness thinks, by the widow and heirs to sell the place to Granville; the witness states that he is sure the Giles land was sold by his brother to pay for the Maury land, and the proceeds were so appropriated; that his recollection is that $3,000 was paid on the Giles County land at the time of sale, and the balance in installments; never heard of any settlement of the place to be made on complainant.   G. A. Pillow agreed with the heirs and widow of his father, that he would sell the Giles land to enable him to pay for the home place, and he, witness, knows that the proceeds of the Giles land, or a large portion thereof, were thus appropriated.

G. A. Pillow conveyed the land in controversy January 1, 1867, to J. H. Thomas, as trustee, to pay debts. In August, 1867, a conditional sale was made to Williams by G. A. Pillow and Thomas, the trustee, and reported to the Chancery Court in the case of *Gid. J.*

*Pillow* v. *Thomas,* in which the public sale by the trustee, for cash, had been enjoined. This decree was confirmed September, 1867, and $10,887.50 paid, and the fund distributed amongst creditors under the order of the Court, and in the fall of 1868 Granville A. Pillow died.

It also appears that the purchase money for the Maury place was all paid off, except a balance remaining unpaid at the date of the deed of trust to Thomas, previous to 1841, and that no part of the price of the lands of complainant could have been applied to the payment of the purchase money of the Maury land, as they were not then sold.

If complainant, therefore, is entitled to any relief, it must be to the extent of the payment of the fund received from her guardian by her husband before the purchase of the home place.

The theory of the bill is, that complainant, being a minor, her guardian refused to surrender to her husband her funds in his hands, except upon the condition that he should invest it in the home place, and take the title to complainant. This the husband agreed to do, and upon this agreement he got the funds and invested it as he had promised to do, but took the title in his own name; and upon this state of facts she filed her bill to set up a resulting trust, and have the "home place" decreed to her, her rights being superior to those of creditors and all others, except purchasers without notice.

No witness testifies as of his own knowledge to the making of such agreement as is charged in the bill. Indeed the proof for the complainant tends rather to

establish the proposition that the agreement was, that the conveyance was to be taken to the husband, and by him made to the wife. And all the evidence to sustain this view is that made of the declarations of Granville A., at different periods. Mrs. Martin states that he was to invest her means in a home and settle it on her, and he said he intended to keep his word and settle the home place on her.

Granville, jr., said he was to settle "a home on her in Tennessee."

Tyler says he promised the guardian he would settle the home place on her.

The proof shows that Granville Pillow did not buy the home place until October, 1834, and had no interest in it, beyond his own share, at the time he received the money from his wife's guardian—when, it is alleged, these promises were made. Gideon J. and Jerome Pillow prove that there was no agreement to sell, or even negotiation about the sale, until some time after the receipt of the money from the guardian in February and April, 1834. Two of the brothers and one sister of Granville A., and a sister of complainant were examined, and they never heard of any such agreement by Granville A., or claim of complainant, until since the death of said Granville A. Although it is shown that complainant insisted upon her husband's settling the home place upon her, as long ago as 1853 and 1856, and talked with her sister about his unwillingness to do so, and the reasons of his unwillingness, she did not

state that he had agreed to do so when he got her money.

The admissions of a party are always liable to be misunderstood, and in a case where it is sought to set up a claim against the recitals of a deed, the evidence should be clear, full and convincing, especially after the lapse of so many years, or where the trust is not claimed until after the death of the alleged trustee. Bro. on F., § 91.

But if the agreement was, not that the title to the land should be taken to complainant, but that her husband should take it to himself, and that he should then, at some indefinite future time, settle it upon, or convey it to the wife, such an agreement, being a parol promise to convey land, would be void by the Statute of Frauds.

The trust must result, if at all, at the instant the deed is taken, and the legal title vests in the grantee. Perry on Trusts, § 133.

But if the proofs of the alleged agreement is not of that clear and convincing character required, we are of opinion that the evidence to sustain the allegation that complainant's money paid for the home place, is still less satisfactory.

We think it is shown that a portion of her means was applied to the building of the house, and to the payment for the land. But, as we understand the evidence, viewed in its most favorable aspect for complainant, there is no pretence that the husband made

any agreement as to any property of the wife, except that held by the guardian, and for which he executed receipts. This money, amounting to about $4,000, was received in February and April, 1834. The husband was, probably, indebted at that time for land and negroes previously bought, in about the same sum. He had not then bought or negotiated for the home place, and did not buy until the 30th of October thereafter, and then stipulated to make his first payment of $3,-000 on March 1st, 1835. If he had had the $4,000, or any part of it, on hand at the time of this contract, he would most probably have then paid it, rather than hold it. He did pay in December $460, and February 20, 1835, he sold his Giles land, and, as Gen. Pillow and Jerome Pillow testify, he then received $3,000 on the Giles land, and paid $3,000 on the home place. These facts and coincidences render it almost certain that the $3,000 paid on the home place was received as a payment on the Giles land, and that the $4,000 received from the guardian had been in some way else disbursed before. The $460 paid in December, may or may not have been a part or remainder of the sum received from the guardian. It is to-day, the most of it, uncertain where it came from.

In view of these facts we can not say that it is clearly and satisfactorily proved that any part of the $4,000 received from the guardian was applied to the payment for the home place, and without the clearest and most convincing evidence that it was so applied,

there is no ground for declaring a resulting trust in favor of complainant. It is insisted that if it is held that complainant is not entitled to claim the land upon the ground of a resulting trust, that she is entitled to dower out of the same.

The record shows that she has received dower in all the lands except a small tract of twelve acres and the lands sold to Williams.

Section 2,399 of Code provides that the widow is entitled to dower on lands mortgaged or conveyed in trust to pay debts when the husband dies before foreclosure of the mortgages or sale under the deed.

The 538 acres were conveyed in trust to Jas. H. Thomas, trustee, to pay debts, by Major Pillow, on January 1, 1867. In August thereafter the trustee and Major Pillow agreed to sell to Williams; Pillow, in writing, conveyed and relinquished his right to redeem; the contract of sale was reported to the Chancery Court and confirmed in September; the possession was surrendered to Williams; Major Pillow died in the fall of 1868.

We do not think the widow is entitled to dower of the 538 acres sold to Williams. It was sold under the power given in the trust deed, by the trustee, Major Pillow uniting in the contract of sale, and conveying his equity of redemption. The sale was confirmed by the Chancery Court, and dower is excluded by the express terms of the Code. There was "a sale under the deed," and that sale was confirmed by the Court, and it was not essential that title should have been divested

and vested, formally, by the decree of the Court, to exclude the right of dower.

The result is that the decree of the Chancellor dismissing the bill will be affirmed.

The costs of this Court will be paid by Thomas, trustee, out of the trust fund in his hands, and the costs of the Chancery Court as adjudged by the Chancellor.